IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SALAM SYED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  10-3113 |
| | ) | |
| THE BOARD OF TRUSTEES | ) | |
| OF SOUTHERN ILLI | ) | |
| UNIVERSITY, et al., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

This matter comes before the Court on the Defendants Board of Trustees of Southern Illinois University (Board), Andrew J. Varney, M.D., Christine Y. Todd, M.D., and David S. Resch, M.D.'s Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) for Lack of Jurisdiction and for Failure to State a Claim Upon Which Relief Can be Granted (d/e 12) (Motion).  Plaintiff Salam Syed, M.D., participated in the residency program (Residency Program) at Southern Illinois University (University) School of Medicine (School of Medicine).  He was not renewed as a third year resident.  Dr. Syed's nine-count Complaint (d/e 1) alleges three federal civil rights violations.  Count I alleges retaliation in violation of the First

1

Amendment; Count II alleges a violation of due process; and Count III alleges a "class-of-one" violation of equal protection. Complaint, Counts I-III. In addition, Dr. Syed alleges six state-law claims. Complaint, Counts IV-IX.

The Defendants moved to dismiss all of the Complaint except the individual capacity claims in Count III. Upon review of the Complaint, the Court directed the parties to address whether Count III should also be dismissed in light of the Supreme Court's decision in Engquist v. Oregon Department of Agriculture. Text Order entered July 6, 2010; see Engquist, 553 U.S. 591, 128 S.Ct. 2146 (2008). The Court may, sua sponte, raise the issue of whether a claim should be dismissed with notice to the parties. Dawson v. Newman, 419 F.3d 656, 660 (7th Cir. 2005). The parties have now fully briefed the Motion and the issue raised by the Court. For the reasons set forth below, the Complaint is dismissed. Dr. Syed fails to state a claim for a due process violation in Count II, and the Defendants are entitled to qualified immunity on the First Amendment retaliation and class-of-one equal protection claims in Counts I and III. The Court dismisses the remaining state-law claims without prejudice because the Court declines to exercise supplemental jurisdiction over those claims.

For purposes of this Motion, the Court must accept as true all well-pleaded factual allegations contained in the Complaint and draw all inferences in the light most favorable to Dr. Syed.  Hager v. City of West Peoria, 84 F.3d 865, 868-69 (7th Cir. 1996); Covington Court, Ltd. v. Village of Oak Brook, 77 F.3d 177, 178 (7th Cir. 1996).  The Court may also consider documents referenced in the Complaint and central to the claim.  Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998).  When read in that light, the Complaint must set forth a short and plain statement of the claims showing that Dr. Syed is entitled to relief.  Fed. R. Civ. P. 8(a); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 559-63 (2007); Airborne Beepers & Video, Inc. v. AT & T Mobility LLC, 499 F.3d 663 (7th Cir. 2007).  In doing so, the allegations must plausibly suggest that Dr. Syed is entitled to relief.  Twombly, 550 U.S. at 569 n.14.  Allegations of bare legal conclusions or labels alone are not sufficient.  Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009).

## STATEMENT OF FACTS

The allegations are taken from the Complaint and the contractual documents accompanying the Motion. The Court considers the contractual documents because the contract between the parties is referenced in the

Complaint and is central to Dr. Syed's due process claim. Levenstein, 164 F.3d at 347. On September 15, 2007, Dr. Syed entered into an Agreement to accept the position as a second-year resident in the School of Medicine's Department of Internal Medicine (Department). The parties executed a written Agreement. Motion, Exhibit A, Affidavit of Andrew J. Varney, M.D. (Varney Affidavit), Exhibit 1, Agreement With Physician - 2007-2008 (2007 Agreement). The 2007 Agreement was between Dr. Syed, the School of Medicine, and St. John's Hospital of Springfield, Illinois (St. John's). St. John's agreed to pay Dr. Syed a salary of $45,137.00 for the term of the residency, plus benefits. Id., ¶ A. The School of Medicine agreed to provide a graduate medical education program to Dr. Syed. Id., ¶ B. Dr. Syed agreed to perform duties as assigned by the Residency Program Director and approved by St. John's. These duties included providing patient care. Id., ¶ C. The term of the 2007 Agreement ran from August 29, 2007, to August 28, 2008, and renewed automatically unless the Residency Program Director gave four months written notice. Id., ¶ H. Defendant Dr. Varney was an associate professor of medicine in the Department and the Residency Program Director. Defendants Drs. Resch and Todd were also associate professors of medicine in the Department.

4

In early January 2008, Dr. Syed was on night call at Memorial Medical Center in Springfield, Illinois (Memorial), as part of his residency. Dr. Syed observed the treatment of a patient identified as "JB". Defendant Dr. Resch admitted JB to Memorial's psychiatric unit through the emergency room. Before leaving Memorial at the end of his shift, Dr. Syed documented his observations of the treatment given to JB by School of Medicine faculty in a handwritten note which he placed in JB's medical file. JB died after Dr. Syed's shift ended. Complaint, ¶¶ 18-21.

Dr. Syed reported for rounds the next day. In the presence of other residents, School of Medicine faculty member Dr. Praveen Kandula asked if Dr. Syed knew what happened to JB. Dr. Syed stated that he did not know what happened to JB. Dr. Syed also stated that he advised Dr. Resch and others on the School of Medicine's faculty of the seriousness of JB's condition, but they ignored him. Dr. Kandula became upset and told Dr. Syed that if a malpractice suit was filed, Dr. Syed would not be spared. Complaint, ¶¶ 22-24.

Thereafter, School of Medicine officials and faculty, including Drs. Varney, Todd, and Resch, targeted Dr. Syed for less favorable treatment than similarly situated residents in the Residency Program. In March 2008,

5

the Department sent Dr. Syed an email informing him that he had to pass the United States Medical Licensing Exam - Step 3 by the end of April 2008 or he would not be promoted to a third year resident position (PGY-3) at the conclusion of the year. Dr. Syed passed the test on his first try in March 2008. Other residents took the test several times before they passed. Complaint, ¶¶ 30-33.

On April 14, 2008, Dr. Todd advised Dr. Syed by email that: (1) the American Board of Internal Medicine (ABIM) required a resident to be rated a "4" or above to gain promotion to third year status, and (2) Dr. Syed would be required to participate in a stimulated recall exercise (Exercise).[1] The Exercise would be recorded. According to Dr. Todd's email, the results would be "reviewed extensively" with Dr. Syed and presented to the Clinical Competency Committee together with recommendations for any remediation that would be helpful to Dr. Syed. Dr. Resch was one of the physicians assigned to observe and assess Dr. Syed's performance in the Exercise. Complaint, ¶¶ 34-36.

Dr. Syed participated in the Exercise. At the conclusion of the Exercise, School of Medicine officials met with Dr. Syed. The officials asked

---

[1] The Complaint does not explain the term "stimulated recall exercise."

6

numerous question of Dr. Syed's performance. Dr. Syed received little instruction or advice on how to improve his performance. Complaint, ¶ 37.

On May 23, 2008, School of Medicine officials, including Drs. Varney, Todd, and Resch, placed Dr. Syed on probation and instructed Dr. Todd to prepare a remediation plan. On June 10, 2008, Drs. Todd and Varney met with Dr. Syed and gave him a letter informing him that he had been placed on probation and the terms of the probation. The remediation plan prepared by Dr. Todd required Dr. Syed to do the following: (1) obtain a "5" rating on all rotations even though the ABIM only required a "4" rating to gain promotion; (2) complete all Hopkins Ambulatory Modules and ACP online modules before September 1, 2008; (3) sit for the NBME Shelf Test in medicine on July 2, 2008; and (4) make case presentations that contained the organization and quality level expected of a third year resident. Dr. Syed believed that no other resident was required to obtain a "5" rating on all rotations in order to gain promotion to third year status. Complaint, ¶¶ 38-45.

On August 21, 2008, School of Medicine officials met to discuss Dr. Syed's residency. Dr. Resch presented a motion to terminate Dr. Syed from the residency program. School of Medicine officials, including Drs. Varney

7

and Todd, approved of Dr. Resch's motion to terminate Dr. Syed. Complaint, ¶¶ 46-47.

Dr. Syed filed a grievance. The Grievance Committee held a hearing on October 21, 2008. Dr. Todd made false accusations at the hearing. Among the false accusations, Dr. Todd falsely asserted that Dr. Syed used the fact that English was his second language to evade questions posed to him by instructors. Complaint, ¶¶ 49-51.

The Grievance Committee made a recommendation to J. Kevin Dorsey, M.D., Ph.D., and Robert Ritz, the President and CEO of St. John's. Dr. Dorsey and Mr. Roberts adopted the recommendation of the Grievance Committee and overturned the termination of Dr. Syed from the Residency Program. The Department was directed to implement another remediation program. Complaint, ¶¶ 52-53. The second remediation plan started in November 2008. Dr. Todd actively thwarted Dr. Syed's ability to meet the requirements of the second remediation plan. Complaint, ¶¶ 54-61.

In December 2008, JB's widow filed a wrongful death action. In early 2009, the attorney representing the plaintiff in the wrongful death action interviewed Dr. Syed. During the interview, Dr. Syed described his interactions with School of Medicine faculty, including Dr. Resch, in the JB

8

case. Dr. Syed also discovered during the interview that his note had been removed from JB's medical file. Complaint, ¶¶ 25-29.

On February 9, 2009, Dr. Syed entered into a new written agreement with the School of Medicine and St. John's. Varney Affidavit, Exhibit 2, Agreement with Physician 2008-2009 (2009 Agreement). The term of the 2009 Agreement was from December 8, 2008, to April 30, 2009. The 2009 Agreement contained an Addendum which recited that Dr. Syed was on probation, and that the Residency Program could terminate Dr. Syed's residency on 30 days' notice. 2009 Agreement, attached Addendum, at 2.

On March 30, 2009, Dr. Varney sent Dr. Syed a letter notifying him that the 2009 Agreement would be extended to May 15, 2009, to complete the evaluation of Dr. Syed. Varney Affidavit, Exhibit 4, Letter dated March 30, 2009. On April 14, 2009, Dr. Syed received notice that his residency would be terminated effective May 15, 2009. Complaint, ¶ 62.

Dr. Syed again grieved his termination. Dr. Varney was the School of Medicine representative at the grievance hearing. Dr. Todd assisted him. Drs. Varney and Todd acted improperly during the hearing, presented improper evidence, and denied Dr. Syed the opportunity to cross examine witnesses. The School of Medicine officials approved all of Drs. Varney and

9

Todd's improper conduct at the hearing. In June 2009, Dr. Syed was terminated from the Residency Program. The Defendants did not treat similarly situated residents who did not speak out about the treatment of JB in the same manner that they treated Dr. Syed. Complaint, ¶¶ 63-70. Dr. Syed then brought this action.

ANALYSIS

Dr. Syed alleges nine counts against the Board and Drs. Varney, Todd, and Resch:

> Count I alleges that Defendants retaliated against Dr. Syed for speaking out about the treatment of JB in violation of his federal First Amendment rights;
>
> Count II alleges that the Defendants violated Dr. Syed's federal right to procedural due process in terminating his residency;
>
> Count III alleges that the Defendants violated Dr. Syed's federal right to equal protection by treating him differently than similarly situated residents;
>
> Count IV alleges that the Defendants violated Dr. Syed's Illinois constitutional right to free speech;
>
> Count V alleges that the Defendants violated Dr. Syed's Illinois constitutional right to due process;
>
> Count VI alleges that the Defendants violated Dr. Syed's Illinois constitutional right to equal protection;
>
> Count VII alleges defamation claims against Drs. Varney and Todd;

>Count VIII alleges tortious interference claims against Drs. Varney, Todd, and Resch; and

>Count IX alleges intentional infliction of emotional distress claims against Drs. Varney, Todd, and Resch.

The Defendants moved to dismiss Counts I, II, IV-IX, and the official capacity claims in Count III. The Court directed the parties to address whether the individual capacity claims in Count III should be dismissed. Text Order entered July 6, 2010. Dr. Syed concedes that the official capacity claims should be dismissed. Response to Motion to Dismiss (d/e 15), at 1. As explained below, the federal claims against the Defendants in their individual capacities must also be dismissed.

COUNT I

Dr. Syed seeks to assert a claim under 42 U.S.C. § 1983 for retaliation in violation of his First Amendment right to freedom of speech. To state such a claim, Dr. Syed must allege that he engaged in protected activity by exercising his right to freedom of speech, and the Defendants retaliated against him under color of law for engaging in that protected activity to deter that activity. Matrisciano v. Randle, 569 F.3d 723, 730 (7th Cir. 2009) (overruled on other grounds, Fairley v. Andrews, 578 F.3d 518, 525-26 (7th Cir. 2009)). The question of whether Dr. Syed engaged in protected

activity turns on the circumstances under which he made the statements at issue. This issue turns on whether Dr. Syed should be treated as an employee or a student. The difference is significant.

If Dr. Syed is considered an employee, then he fails to state a claim. As a state employee, Dr. Syed must allege that he spoke out as a citizen on a matter of public concern and the Defendants retaliated against him for exercising his rights. Garcetti v. Ceballos, 547 U.S. 410, 417-18 (2006); Vose v. Kliment, 506 F.3d 565, 569 (7th Cir. 2007). When, however, "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. Dr. Syed placed the note regarding his observations of the treatment of JB in JB's medical file while he was on duty the night that JB came into Memorial's emergency room, and he spoke during rounds while he answered questions posed by a School of Medicine faculty member, Dr. Kandula. If Dr. Syed is viewed as an employee, he made that statement pursuant to his official duties while he was working as a resident at Memorial. Thereafter, the Defendants retaliated against him. As an employee, he was not "speaking as a citizen for First Amendment

12

purposes, and the Constitution [did] not insulate [his] communications from employer discipline." Id.

If Dr. Syed is viewed as a student in graduate school, his speech may be protected. Generally, a state university may not punish a student based on the content of his speech. See Papish v. Board of Curators of University of Missouri, 410 U.S. 667, 671 (1973). Dr. Syed alleges that the Defendants retaliated against him because of the content of his note in JB's file and his statements during rounds the next day. Dr. Syed worked at Memorial and participated in rounds as part of his graduate education. He, therefore, made the statements about JB as part of his educational experience in the Residency Program.

Neither party has cited authority clearly establishing the appropriate analysis for physicians participating in state-run graduate education residency programs who are also paid for providing medical care to patients. In light of this lack of authority, the Defendants are entitled to qualified immunity for the First Amendment claims brought against them in their individual capacities. Pearson v. Callahan, __U.S.__, 129 S.Ct. 808, 815-16 (2009). Qualified immunity exists to protect state officials from personal liability when the officials lack clearly established legal rules to guide their

conduct. See Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982) ("But where . . . clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" (quoting Pierson v. Ray, 386 U.S. 547, 554 (1967)). The Defendants in this case lacked clear guidance on Dr. Syed's status for First Amendment purposes. If the rule in Garcetti applies, Dr. Syed did not engage in protected activity; if the principles in cases such as Papish apply, he may have engaged in protected activity. The ambiguity left the Defendants with no notice of whether their conduct violated Dr. Syed's rights. The Defendants are therefore entitled to be protected by the defense of qualified immunity. To overcome this defense, Dr. Syed must show that controlling authority existed at the time that clearly established that the Defendants' conduct violated Dr. Syed's First Amendment rights. Pearson, 129 S.Ct. at 815-16. Dr. Syed has presented no such authority. Count I is dismissed.

COUNT II

Dr. Syed fails to state a § 1983 due process claim in Count II. To state such a claim, Dr. Syed must allege that he had a liberty or property interest and that the Defendants denied him that interest without due

14

process of law. Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78, 82 (1978). Any possible property interest in either education or employment must be based on a state law or contract. Id., at 82; Williams v. Wendler, 530 F.3d 584, 589 (7th Cir. 2008). Dr. Syed identifies no state law that grants him a property interest in his position in the Residency Program. He may have had a property interest in the 2009 Agreement, but the 2009 Agreement ended on May 15, 2009, after the required thirty days notice. Once the 2009 Agreement ended, Dr. Syed had no contractual right to his position as a resident, and therefore, no property interest. Dr. Syed fails to state a claim for denial of property without due process.

Dr. Syed has a liberty interest in pursuing either his chosen profession or his education; however, he fails to allege a denial of that liberty interest. To state a claim for a denial of his liberty, Dr. Syed must allege that the Defendants publically and wrongfully besmirched his reputation to such a degree that he became so stigmatized that he could no longer pursue his chosen profession or education. Head v. Chicago School Reform Bd. of Trustees, 225 F.3d 794, 802 (7th Cir. 2000); Lashbrook v. Oerkfitz, 65 F.3d 1339, 1348-49 (7th Cir. 1995); see Horowitz, 435 U.S. at 84. Dr. Syed

15

does not allege that the Defendants publically disseminated any statements about him. Thus, he fails to state a claim.

Furthermore, charges of professional inadequacy do not impose the sort of stigma that infringes on the liberty interest to pursue a profession. Lashbrook, 65 F.3d at 1348. To interfere with a person's liberty interest, the Defendants must attack "the individual's good name, reputation, honor or integrity" with "charges as immorality, dishonesty, alcoholism, disloyalty, Communism, or subversive acts." Id. Dr. Syed does not allege that any Defendant made these types of attacks on his personal integrity. He, therefore, fails to state a claim for denial of a liberty interest without due process. Count II is dismissed.

COUNT III

Like Count I, Dr. Syed's equal protection claim in Count III turns on whether he should be viewed as an employee or a student, and like Count I, the Defendants are entitled to qualified immunity. Dr. Syed alleges that the Defendants treated him differently than similarly situated residents in the Residency Program in violation of his right to equal protection. Dr. Syed does not allege that the Defendants singled him out for this disparate treatment because of his membership in a suspect class, such as his race,

16

religion or national origin. He, therefore, seeks to assert a "class-of-one" equal protection claim. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) ("[T]he plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

Public employees, however, cannot assert class-of-one claims based on adverse employment actions because the state, as employer, must have the discretion to treat individual employees differently in order to manage its operations. Engquist, 128 S.Ct. at 2155-56. The principle announced in Engquist may apply in other circumstances in which the state must exercise discretion to make individualized decisions. E.g., Avila v. Pappas, 591 F.3d 552, 554 (7th Cir. 2010) (principles in Engquist apply to the exercise of prosecutorial discretion).

Dr. Syed has not presented controlling authority clearly establishing whether he should be considered an employee or a student for purposes of the Supreme Court's analysis in Engquist, or whether the analysis in Engquist should be extended to physicians who are providing patient care in state-run residency programs. The Defendants, therefore, are entitled to qualified immunity for the class-of-one equal protection claims in Count III

brought against them in their individual capacities. <u>Pearson</u>, 129 S.Ct. at 822.

Dr. Syed cites recent decisions from the Northern District of Illinois for the proposition that students may still assert class-of-one claims after <u>Engquist</u>. <u>Santana v. Cook County Bd. of Review</u>, __ F.Supp.2d__, 2010 WL 1235900 (N.D. Ill. 2010); <u>Kyung Hye Yano v. City Colleges of Chicago</u>, 2009 WL 855977 (N.D.Ill. 2009). These two cases are not persuasive. The <u>Santana</u> decision was issued in 2010, after the Defendants engaged in the alleged wrongful conduct. The defense of qualified immunity turns on the law that was clearly established at the time the alleged wrongful conduct occurred. <u>Harlow</u>, 457 U.S. at 818. Cases that were decided after the fact, such as <u>Santana</u>, are not relevant.[2] In addition, District Court decisions from a different District, such as <u>Santana</u> and <u>Yano</u>, are not controlling authority, and so, are not sufficient to overcome the defense of qualified immunity. <u>Baird v. Renbarger</u>, 576 F.3d 340, 345 (7th Cir. 2009) (controlling authority in this Circuit for qualified immunity purposes are Supreme Court and Seventh Circuit precedent). Count III is dismissed.

---

[2]The <u>Yano</u> decision was decided on March 30, 2009, after the Defendants had committed most of the alleged wrongful conduct. As explained above, the <u>Yano</u> decision is not relevant because District Court decisions are not controlling authority.

The federal claims are dismissed, and the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

THEREFORE, Defendants Board of Trustees of Southern Illinois University, Andrew J. Varney, M.D., Christine Y. Todd, M.D., and David S. Resch, M.D.'s Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) for Lack of Jurisdiction and for Failure to State a Claim Upon Which Relief Can be Granted (d/e 12) is ALLOWED. Counts I, II, and III are dismissed with prejudice. The remaining Counts are dismissed without prejudice for lack of subject matter jurisdiction. All pending motions are denied as moot. This case is closed.

ENTERED this 18th day of August, 2010

s/ **Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE